FOULSTON SIEFKIN LLP
1551 North Waterfront Parkway, Suite 100
Wichita, Kansas  67206-4466
Telephone:  316-267-6371
Facsimile:  316-267-6345

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| and | ) ) |
| MELISSA BELL, SAHRA CARTER, MAKEESHA DELANEY, ANGELA GARCIA, VERNCINA HUTTO, REBECCA MARTINEZ, ELIZABETH PARKER, TAMARA RANSOM, and SHANNON SMITH (f/k/a HUNTER) | ) ) ) ) ) ) ) Civil Action No. 08-CV-01274-JTM-KMH |
| Plaintiff-Intervenors, | ) ) |
| v. | ) ) |
| AKAL SECURITY, INC., | ) ) |
| Defendant. | ) ) |

## INTERVENORS' COMPLAINT

COMES NOW Plaintiff-Intervenors, Melissa Bell, Sahra Carter, Makeesha Delaney, Angela Garcia, Verncina Hutto, Rebecca Martinez, Elizabeth Parker, Tamara Ransom, and Shannon Smith (f/k/a Shannon Hunter) by and through their counsel, Foulston Siefkin LLP, and bring this action against Defendant, Akal Security, Inc.

### Parties

1.  Plaintiff Melissa Bell is a citizen of the United States and a resident of Killeen, Bell County, Texas.

2. Plaintiff Sahra Carter is a citizen of the United States and a resident of Clarksville, Montgomery County, Tennessee.

3. Plaintiff Makeesha Delaney is a citizen of the United States and a resident of Hinesville, Liberty County, Georgia.

4. Plaintiff Angela Garcia is a citizen of the United States and a resident of Hinesville, Liberty County, Georgia.

5. Plaintiff Verncina Hutto is a citizen of the United States and a resident of Eustis, Lake County, Florida.

6. Plaintiff Rebecca Martinez is a citizen of the United States and a resident of Hondo, Medina County, Texas.

7. Plaintiff Elizabeth Parker is a citizen of the United States and a resident of Indian Mound, Stewart County, Tennessee.

8. Plaintiff Tamara Ransom is a citizen of the United States and a resident of Manhattan, Riley County, Kansas.

9. Plaintiff Shannon Smith (f/k/a Shannon Hunter) is a citizen of the United States and a resident of Ft. Wainwright, Fairbanks North Star County, Alaska.

10. Defendant Akal Security, Inc. ("Akal") is a private corporation, incorporated in the State of New Mexico and authorized to do business in the State of Kansas.

11. Defendant may be served with process through its resident agent, The Corporation Company, Inc., at 515 Kansas Ave., Topeka, KS 66603.

12. Akal is engaged in the business of providing private security services and has operations in numerous states. Akal, pursuant to contracts with the U.S. Department of Defense, provides or has provided security guard services at Fort Stewart, Georgia; Fort Riley, Kansas; and Fort Campbell, Kentucky, among other U.S. Army installations.

**Jurisdiction and Venue**

13.  This is an action seeking legal and equitable relief for unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII"), 42 USC § 2000e *et seq.* and the Civil Rights Act of 1991.

14.  This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331.

15.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

**General Allegations**

16.  Akal required all individuals employed as a Guard at any of the U.S. Army installations to pass a physical fitness exam.

17.  The initial physical fitness exam was given to each Guard at the start of her employment with Akal.  Each Guard was required to retake the physical fitness exam in the vicinity of her employment anniversary date each year thereafter.

18.  The particular requirements of the physical fitness exam varied based on the age of the Guard.

19.  For a Guard fifty years old and under, successfully completing the physical fitness exam required the Guard to perform a certain number of push-ups and sit-ups within a specified timeframe, and to complete a one mile run within a certain timeframe.

20.  For a Guard between fifty-one and fifty-nine years old, successfully completing the physical fitness exam required the Guard to complete a one mile run in less than twenty minutes.  Guards between the age of fifty-one and fifty-nine were not required to complete push-ups or sit-ups to pass the physical fitness exam.

21.  For a Guard over the age of sixty, successfully completing the physical fitness exam required the Guard to complete a one and one-half mile walk in less than thirty minutes.

Guards over the age of sixty were not required to complete push-ups or sit-ups to pass the physical fitness exam.

22. Akal's corporate Human Resources department is located at the Company's corporate headquarters in New Mexico. Akal's Human Resources department is aware of and involved in all decisions involving the termination of employment.

### *Melissa Bell*

23. Plaintiff Melissa Bell began her employment with Akal during December of 2004 as a Guard for Akal at the Fort Hood, Texas location.

24. During December 2004 or January 2005, Ms. Bell took and passed the annual physical fitness examination required by Akal.

25. Ms. Bell learned that she was pregnant on or about, February 12, 2005. Shortly thereafter, she provided a note from her physician verifying her pregnancy to her supervisor, Mr. Coffey.

26. Ms. Bell was not given any restrictions by her physician that impacted her ability to perform the day-to-day duties of a Guard for Akal.

27. After learning of her pregnancy, Akal assigned Ms. Bell to a remote gate assignment at Fort Hood.

28. The remote gate assignment resulted in Ms. Bell working twelve-hour shifts instead of the eight-hour shifts she had worked prior to informing Akal of her pregnancy.

29. The remote gate assignment had limited facilities and less staffing. The limited facilities required Ms. Bell to use a portable restroom instead of a conventional restroom. The lower level of staffing resulted in less break time being availalble to Ms. Bell.

30. Approximately two weeks after moving Ms. Bell to the twelve-hour shifts and remote gate assignment, Mr. King (Akal's Chief of Guards at Fort Hood) called Ms. Bell to his office and notified Ms. Bell that she needed to pass another physical fitness exam.

31. Ms. Bell asked Mr. King why she needed to take another physical fitness examination when she had just passed one in January of 2005. Mr. King informed Ms. Bell that Akal could require a physical fitness exam at any point he wanted. Mr. King also stated that Ms. Bell would not be able to remain employed by Akal if she did not pass another physical fitness examination.

32. Ms. Bell was the only person that passed a physical fitness examination at the start of her employment and was subsequently required to retake the exam within four months.

33. Ms. Bell informed Mr. King that she was not unable to take the physical fitness exam that required push-ups, sit-ups, and a one mile run due to the restrictions associated with her pregnancy.

34. Ms. Bell could have taken one of the alternate physical fitness exams that Akal provides to some of its employees. Akal did not provide Ms. Bell the opportunity to take an alternate physical fitness exam.

35. Mr. King required Ms. Bell to resign her employment with Akal due to her inability to take the physical fitness examination. Ms. Bell resigned in March 2005.

*Sahra Carter*

36. Plaintiff Sahra Carter began employment with Akal during May of 2005, as a Guard for Akal at the Fort Campbell, Kentucky location.

37. Ms. Carter learned that she was pregnant during July of 2005. Ms. Carter informed Mr. Vaughn (Akal's Lieutenant of the Guard's), her supervisor, of her pregnancy during July of 2005.

38. During September of 2005, Ms. Carter was told by Akal that her employment would be terminated at the point she was unable to work due to the birth of her child.

39. At various points between September 2005 and December 2005, Akal management, including Mr. Glassen (Akal's Captain of Guards at Fort Campbell) and/or Mr. Miskow (Akal's Chief of Guards at Fort Campbell) encouraged Ms. Carter to take a leave of absence instead of working while she was pregnant. During each discussion, Ms. Carter expressed her desire to continue working.

40. At one point between September 2005 and December 2005, Mr. Glassen told Ms. Carter that her pregnancy was creating staffing problems for Akal.

41. On or about December 21, 2005, Mr. Glassen again encouraged Ms. Carter to take a leave of absence rather than continue working. Ms. Carter refused.

42. On or about December 28, 2005, Akal assigned Ms. Carter to work on Gate 4. Gate 4 contained no shelter from the harsh winter elements.

43. Ms. Carter's next scheduled day of work was December 30, 2005. Upon her arrival that day, she was told she had to meet with Mr. Miskow rather than reporting to a post.

44. When Ms. Carter arrived at the scheduled time to speak with Mr. Miskow, Mr. Glassen was there instead. Mr. Glassen told Ms. Carter to sign some paperwork putting her on an administrative leave of absence. This was done at Mr. Miskow's direction.

45. On or about December 30, 2005, Ms. Carter was involuntarily placed on a leave of absence by Akal. Akal told Ms. Carter that the stated purpose of this leave was for Ms. Carter to obtain certification from her health care provider that she was able to perform the duties of a Guard. Ms. Carter was told she would be able to return to work once this certification was provided.

6

46. Ms. Carter did not ask to be placed on a leave of absence and had no restrictions that limited her ability to perform her job duties as a Guard.

47. On January 3, 2006, Ms. Carter's health care provider provided a written certificate that Ms. Carter was able to work without restrictions. Ms. Carter provided this certification to Akal; however, Akal refused to return her to work.

48. On January 9, 2006, Mr. Miskow told Ms. Carter that he was terminating her employment. On January 10, 2006, Ms. Carter received a letter from Ms. Janet Gunn, Akal's Director of Human Resources, informing her that her employment with Akal had been terminated, ostensibly for absenteeism.

### *Makeesha Delaney*

49. Plaintiff Makeesha Delaney began employment with Akal during December of 2003, as a Guard for Akal at the Fort Stewart, Georgia location.

50. Ms. Delaney found out that she was pregnant in December of 2004. Ms. Delaney notified her supervisor, Mr. Hood (Akal's Lieutenant of the Guards at Fort Stewart), of her pregnancy during December of 2004.

51. During January of 2005, Ms. Delaney was informed that she was due to take her annual physical fitness examination; however, Mr. Williams (Akal's Captain of the Guards at Fort Stewart) would not permit Ms. Delaney to take the physical fitness examination until she obtained a certification from her health care provider that she was medically cleared to take the test.

52. Ms. Delaney subsequently obtained and provided Akal with restrictions from her physician that prohibited her from running, or doing pushups or situps, while she was pregnant. Ms. Delaney's restrictions did not prohibit her from performing the timed walk that is required under one of Akal's alternate physical examination standards.

53. Akal did not permit Ms. Delaney to take the physical fitness examination under either of the alternate standards.

54. Akal placed Ms. Delaney on a leave of absence starting on or about February 22, 2005. Ms. Delaney did not voluntarily choose to take a leave of absence. At the time she was involuntarily placed on leave, Ms. Delaney was able to perform all of her duties as a Guard.

*Angela Garcia*

55. Plaintiff Angela Garcia began her employment with Akal in December 2003 as a Guard at the Fort Stewart, Georgia location. Around March 2004, Ms. Garcia was assigned to Guard Post 3, where she worked as gate supervisor.

56. Ms. Garcia learned of her pregnancy during March of 2005, and informed her supervisor, Mr. Williams (Akal's Captain of the Guards at Fort Stewart) of her pregnancy that month. Mr. Williams informed Mr. James Crumley (Akal's Chief of Guards at Fort Stewart) of Ms. Garcia's pregnancy.

57. Upon learning of Ms. Garcia's pregnancy, Mr. Williams told Ms. Garcia that "as soon as she began to look ridiculous in uniform that she would be taken off duty and placed on leave of absence". Mr. Williams later informed Ms. Garcia that according to Akal's new pregnancy policy, she would have to go on leave as soon as her pregnancy became visible.

58. On or about May 8, 2005, shortly after her meeting with Mr. Crumley, Ms. Garcia was demoted from her supervisory position at Guard Post 3. A less senior male officer was promoted to the gate supervisor position.

59. Ms. Garcia was moved to Guard Post 2 shortly after her demotion. In contrast to Guard Post 3, Guard Post 2 has only one portable restroom, and it was not cleaned on a regular basis.

60. In June 2005, Ms. Garcia met with Mr. Crumley, Mr. Hood (Lieutenant of Guards at Fort Stewart), Mr. Joseph, and Mr. Gaskill about returning to her supervisory position. Akal refused to return her to her position at Guard Post 3.

61. On or about June 28, 2005, Ms. Garcia became ill at work and went to the doctor during her shift. She was able to return to duty later that same day. Mr. Crumley refused to allow Ms. Garcia to return to work until she provided medical documentation to substantiate that she was able to perform her work duties.

62. On July 5, 2005, Ms. Garcia provided Akal with a certification from her physician authorizing her to return to work with a restriction that she be allowed to take a break from standing for 10-15 minutes every 2 hours.

63. This medical restriction did not prevent Ms. Garcia from performing the essential functions of her position as a Guard. At the guard posts to which she had been assigned, Ms. Garcia and her coworkers routinely rotated into a position where sitting was permitted at least once per hour.

64. Despite being able to perform her job duties, on or about July 12, 2005, Ms. Garcia was placed on a leave of absence. Ms. Garcia was opposed to taking a leave of absence and informed Akal that she did not want the leave and wanted to remain actively employed.

65. Akal terminated Ms. Garcia's employment on or about October 31, 2005.

***Verncina Hutto***

66. Plaintiff Verncina Hutto began her employment with Akal during September of 2004, as a Guard at the Ft. Stewart, Georgia location.

67. Ms. Hutto learned she was pregnant around January 2005, and notified her supervisor of her pregnancy no later than February 2005.

68. On or about February 7, 2005, Ms. Hutto missed work due to an illness.

9

69. Mr. James Crumley (Akal's Chief of Guards at Fort Stewart) told Ms. Hutto that she could not return until she obtained a note from her physician stating that she could return to work.

70. Ms. Hutto obtained a note from her physician on February 18, 2005, that authorized her to return to work without medical restrictions. Despite obtaining the note from her physician, Akal would not allow Ms. Hutto to return to work.

71. On or about February 22, 2005, Mr. Crumley called Ms. Hutto in for a meeting. During that meeting, Mr. Crumley presented Ms. Hutto with a document that contained questions related to Ms. Hutto's medical condition, including her pregnancy.

72. During this meeting, Mr. Crumley informed Ms. Hutto that it was a safety hazard to have a pregnant woman working on the gate.

73. Mr. Crumley told Ms. Hutto that she was being placed on a leave of absence, and that she could return to work following the birth of her child.  Ms. Hutto objected to being placed on a leave of absence.

74. Akal involuntarily placed Ms. Hutto on a leave of absence on or about February 22, 2005, and terminated her employment on or about April 15, 2005.

*Rebecca Martinez*

75. Plaintiff Rebecca Martinez began her employment with Akal during March of 2004, as a Guard at the Ft. Hood, Texas location.

76. Ms. Martinez learned that she was pregnant during January of 2005, and notified her supervisor Mr. Smock (Akal's Lieutenant of the Guards at Fort Hood) of her pregnancy during February of 2005.

77. Ms. Martinez missed several days of work in early March due to her pregnancy. She obtained a note from her physician on March 13, 2005, releasing her to resume her full job duties. This note was provided to Akal on or about March 13, 2005.

78. Despite being medically released to return to work, Akal kept Ms. Martinez off the work schedule and did not permit her to return to her job duties.

79. On or about March 17, 2005, Ms. Martinez was summoned to a meeting with Mr. King (Akal's Chief of Guards at Fort Hood). Mr. King presented Ms. Martinez with a memorandum stating that Ms. Martinez' pregnancy prevented her from completing certain tasks, including Akal's annual physical fitness examination and firearms range qualification.

80. At the time of this meeting, Akal had no documentation from Ms. Martinez or her physician that her pregnancy prevented her from performing any of the duties required of a Guard, including requalifying with her firearm and completing the physical fitness examination.

81. During the meeting, Mr. King told Ms. Martinez that he did not want a pregnant employee going to the firing range, and that did not believe Ms. Martinez could pass the physical fitness examination because of her pregnancy.

82. During the meeting, Mr. King told Ms. Martinez that she would be "let go" until her pregnancy was finished. He further told her that she would be allowed to return to work after the birth of her child if she was able to pass a physical fitness test, qualify at the range, and pass the written guard test. Ultimately, Mr. King required Ms. Martinez to sign a "voluntary resignation form."

83. Ms. Martinez complained to Mr. King about not being allowed to continue working while pregnant.

84. After meeting with Mr. King, Ms. Martinez discussed the return of her equipment with the Sergeant (an Akal employee) working in the office. The Sergeant told Ms. Martinez to keep the equipment since she would be returning to work once her child was born.

85. Akal subsequently reported to local law enforcement that Ms. Martinez had stolen the equipment that the Sergent had instructed her to keep until she returned to work.

86. Mr. Brown (Investigator for Akal at Fort Hood) was aware that Ms. Martinez's boyfriend continued to work for Akal. Mr. Brown did not attempt to contact Ms. Martinez through her boyfriend before filing the report that with local law enforcement.

87. The report to local police led to a to a warrant being issued for Ms. Martinez' arrest. Ms. Martinez learned of the warrant around mid-October 2005, after Mr. Brown contacted Ms. Martinez's boyfriend.

88. When Ms. Martinez learned of the warrant she immediately offered to return the equipment and explained to Mr. Brown how she had been instructed to keep the equipment until her return to work. Ms. Martinez asked for Mr. Brown's assistance with the warrant, but he said couldn't do anything and she needed to contact local law enforcement.

89. Ms. Martinez returned the equipment to Akal on or about October 18, 2005. Despite her returning the equipment, Akal initially refused to withdraw the complaint it had filed that led to the arrest warrant.

90. Because the arrest warrant was not withdrawn, Ms. Martinez was forced to turn herself in to law enforcement, which she did on October 19, 2005. Ms. Martinez was required to spend a night in jail, and forced to expend $200 to hire a bail bond company to pay her $2,000 bail so she could be released from jail.

91. Akal refused to assist Ms. Martinez in getting the arrest removed from her criminal record.

92. Ms. Martinez has lost multiple job opportunities because she now has a record of having been arrested for criminal theft.

93. On or about October 10, 2005, and after having deliverd her baby, Ms. Martinez contacted Akal to discuss returning to work. Mr. Arnett (Akal's Captain of the Guards at Fort Hood) told Ms. Martinez that she would not be permitted to return to work at Akal, but refused to provide her with a reason why.

94. Ms. Martinez contacted Akal personnel at Akal's local office in Harker Heights, and Akal's corporate human resources department, but no one returned her calls.

*Elizabeth Parker*

95. Plaintiff Elizabeth Parker began her employment with Akal during July of 2005, as a Guard at the Ft. Campbell, Kentucky location.

96. Ms. Parker notified Mr. Nick Miskow (Akal's Chief of Guards at Fort Campbell) and Mr. Mike Glassen (Akal's Captain of Guards at Fort Campbell) in August 2005 that she was pregnant.

97. In January of 2006, Ms. Parker was scheduled to requalify on the firing range. At that time, Ms. Parker had no medical restrictions that limited her ability to perform her job duties.

98. Mr. Miskow would not allow Ms. Parker to complete the firearms qualification even though she had no medical restrictions preventing her from doing so. He further informed Ms. Parker that she would be placed on a "leave of absence" due to her failure to qualify on the firing range.

99. Ms. Parker complained to Mr. Miskow about this decision and also contacted Akal's Corporate Human Resources office. Ms. Parker's complaints were ineffectual and she was forced to take a leave of absence even though she was able to perform her job duties.

100. At the time Mr. Miskow forced Ms. Parker on a leave of absence, he told Ms. Parker that she could return to her position as soon as her pregnancy was completed.

101. After placing Ms. Parker on a leave of absence against her will, Akal opposed Ms. Parker's claim for unemployment benefits by using a separation statement that Mr. Miskow had forced Ms. Parker to sign.

102. After the birth of her child, Ms. Parker returned to work at Akal during June of 2006. Upon her return she was treated like a new employee. She was required to retake her physical fitness test, requalify on the weapons range, and was not given credit for her prior eight months of employment for benefits eligibility and compensation.

*Tamara Ransom*

103. Plaintiff Tamara Ransom began her employment with Akal during November of 2003 as a Guard at the Fort Riley, Kansas location.

104. Ms. Ransom became aware that she was pregnant around March 2004. She notified Akal of her pregnancy in April 2004.

105. In early June 2004, Ms. Ransom was moved to a part-time clerical position in Akal's office at Fort Riley. Ms. Ransom did not ask to be moved to this position.

106. At the time of her move to the part-time clerical position, Ms. Ransom was physically able to perform all of her job duties as a full-time Guard.

107. Ms. Ransom complained to Mr. Romero (Akal's Chief of Guards at Fort Riley) about being moved from her full-time Guard position to part-time clerical work in the office. Despite her complaints, Akal did not allow Ms. Ransom to return to her position as a Guard.

108. In July 2004, Ms. Ransom requested a leave of absence for the remainder of her pregnancy. Mr. Romero approved Ms. Ransom's request and told her to take as much time off as she needed.

109.    While Ms. Ransom was on the leave of absence and without telling Ms. Ransom, Mr. Romero terminated her employment, effective September 29, 2004.  Ms. Ransom learned that her employment had ended around mid-October, 2004, when she inquired about returning to work.

### *Shannon Smith (Hunter)*

110.    Plaintiff Shannon (Smith) Hunter began her employment with Akal during November of 2003, as a Guard at the Ft. Riley, Kansas location.

111.    Ms. Hunter became aware that she was pregnant during March of 2004.

112.    Shortly after learning of her pregnancy, Ms. Hunter notified her supervisors, Mr. Telfer Halsey (Akal's Lieutenant of the Guards at Fort Riley) and Mr. Henry Huguley (Akal's Lieutenant of the Guards at Fort Riley).

113.    On or about May 6, 2004, Ms. Hunter had to undergo emergency surgery unrelated to her pregnancy.  Ms. Hunter missed three weeks of work as a result of this surgery.

114.    Following her return to work from this surgery, Ms. Hunter asked if she could be temporarily placed in a full-time clerical position at Akal's office at Fort Riley, Kansas, while she fully recovered from the surgery.

115.    Akal granted Ms. Hunter's request and around June 7, 2004, placed her in a clerical position.  The position in which Akal placed Ms. Hunter was not full-time, but only part-time, three days a week.

116.    Ms. Hunter repeatedly asked Mr. Angel Romero (Akal's Chief of Guards at Fort Riley) that she be allowed to return to her full-time Guard position.  Mr. Romero, however, would not allow her to go back to a Guard position.

117.    At various times, Mr. Romero and other members of Akal's management at Fort Riley told Ms. Hunter that Akal could not have pregnant women working as Guards.

15

118. Ms. Hunter complained about Mr. Romero's position regarding pregnant women working as Guards to Mr. Romero and also to Mr. Kennoyer (Akal's Project Manager over the operations at Fort Riley).

119. Akal permitted Ms. Hunter to return to a full-time Guard position in September 2004.

120. Akal terminated Ms. Hunter's employment, effective September 30, 2004, purportedly as part of a reduction in force.

## Causes of Action

### Count I: Pregnancy Discrimination in violation of Title VII
### (on behalf of all named plaintiffs)

121. Plaintiffs incorporate by reference paragraphs 1 through 120 of this Complaint.

122. Each of the plaintiffs was pregnant while employed by Akal, and Akal officials were aware of their pregnancies.

123. Motivated by their pregnancy, Akal treated each plaintiff differently than it treated similarly-situated non-pregnant employees.

124. The forms of discriminatory treatment varied, but always resulted in an employment action that was negative to the particular pregnant plaintiff, whether viewed from an objective or subjective standard.

125. Acting within the scope of their employment, Akal's managerial employees, both at the facility and corporate level, were aware of and actively engaged in, or tacitly approved the employment actions taken against each plaintiff.

126. Akal's treatment of each plaintiff constitutes an unlawful employment practice in violation of 42 U.S.C. § 2000e-2(a)(1), and subjects Akal to liability for the damages suffered by each plaintiff.

### Count II:  Retaliation in violation of Title VII
### (on behalf of plaintiffs Carter, Martinez, Parker, Ransom, and Smith)

127. Plaintiffs incorporate by reference paragraphs 1 through 126 of this Complaint.

128. Each plaintiff voiced objections to her facility manager(s) and/or Akal's human resources department regarding the negative employment actions that Akal was taking against her.

129. In voicing her objections to Akal's management and/or corporate officials, each plaintiff was opposing conduct that she believed in good-faith was unlawful.

130. Motivated by each plaintiff's opposing Akal's actions, Akal managers and/or other officials, acting within the scope of their employment with Akal, took further negative employment actions against each plaintiff.

131. Akal's retaliatory treatment constitutes an unlawful employment practice in violation of 42 U.S.C. § 2000e-3(a), and subjects Akal to liability for the damages suffered by each plaintiff.

WHEREFORE, each plaintiff respectfully requests relief and prays for judgment against defendant in an amount in excess of $75,000, as follows:

   A. Back pay in an amount equal to plaintiffs' lost wages, including their health and welfare wage and the value of any additional employment benefits;

   B. Compensatory damages for the pain and suffering, mental anguish, and emotional distress caused by defendant's unlawful conduct, in an amount to be determined;

   C. Punitive damages in an amount to be determined;

   D. All costs, expenses and attorneys' fees incurred;

   E. Pre-judgment interest, calculated at the maximum rate allowed by law;

   G. Post-judgment interest at the legal rate from the date of the judgment until paid in full; and

   H. Such other and further relief as the Court may deem just and appropriate.

.

Plaintiffs reserve the right to amend their demand for judgment as new information is discovered during the course of this case.

Respectfully submitted,

FOULSTON SIEFKIN LLP
1551 North Waterfront Parkway, Suite 100
Wichita, Kansas 67206-4466

By */s/ Forrest T. Rhodes, Jr.*
Jay F. Fowler                    #10727
Donald D. Berner                 #18330
Forrest T. Rhodes, Jr.           #19567
    *Attorneys for Plaintiff*

**DEMAND FOR JURY TRIAL**

Plaintiff, pursuant to Fed. R. Civ. P. 38(b), hereby requests a jury trial on all issues in the above-captioned matter.

Respectfully submitted,

FOULSTON SIEFKIN LLP
1551 North Waterfront Parkway, Suite 100
Wichita, Kansas  67206-4466


By */s/ Forrest T. Rhodes, Jr.*
Jay F. Fowler                               #10727
Donald D. Berner                        #18330
Forrest T. Rhodes, Jr.                  #19567
   *Attorneys for Plaintiff*

**DESIGNATION OF PLACE OF TRIAL**

Plaintiffs designate Wichita, Kansas, as the place of trial of this matter.

                                  Respectfully submitted,

                                  FOULSTON SIEFKIN LLP
                                  1551 North Waterfront Parkway, Suite 100
                                  Wichita, Kansas  67206-4466

                                By */s/ Forrest T. Rhodes, Jr.*

| | |
|---|---|
| Jay F. Fowler | #10727 |
| Donald D. Berner | #18330 |
| Forrest T. Rhodes, Jr. | #19567 |

                                          *Attorneys for Plaintiff*